UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

TIANA BATISTE-WADDELL,

Plaintiff,

v.                                                    CASE NO. 3:22-CV-540-SJF

SOUTH BEND COMMUNITY SCHOOL
CORPORATION,

Defendant.

**OPINION and ORDER**

Plaintiff, Tiana Batiste-Waddell ("Batiste-Waddell"), is a former employee of

Defendant, the South Bend Community School Corporation ("SBCSC"). On July 5, 2022,

she submitted a complaint against Defendant under 42 U.S.C. § 1981 ("§ 1981") and 42

U.S.C. § 2000e *et al.* ("Title VII"). The first statute guarantees that, among other things,

"all persons within the jurisdiction of the United States shall have the same right in

every State and Territory to make and enforce contracts . . . , and to the full and equal

benefit of all laws and proceedings for the security of persons and property." 42 U.S.C.

§ 1981(a). The second statute prohibits employment discrimination based on race, color,

religion, sex, and national origin. 42 U.S.C. § 2000e-2. Plaintiff asserts claims  that

Defendant discriminated against Plaintiff on the basis of race and gender; created a

harassing and hostile work environment on the basis of race and gender; and retaliated

against Plaintiff, on the basis of race and gender, for engaging in protected activity. The

Defendant moves for summary judgment, pursuant to Fed. R. Civ. P. 56, on the grounds

that Plaintiff cannot make a prima facie case for discrimination, hostile work environment, or retaliation, and that, even if she can make such a prima facie case, she cannot put forth any evidence casting doubt on Defendant's legitimate, non-discriminatory, non-retaliatory reasons for its actions.

I.    **FACTUAL BACKGROUND**

### A.  Summary

The events giving rise to this case are as follows: In February of 2021, after a lengthy period of employment with Defendant SBCSC, Plaintiff Batiste-Waddell, who was then serving as a middle school principal, was placed on paid administrative leave. This action was taken by her then-supervisors, Jason Zook and Diamond Robinson, pending an internal investigation into various aspects of her job performance. After Plaintiff was placed on administrative leave, she filed a complaint against Defendant with the Equal Employment Opportunity Commission. Though she was eventually reassigned as an "administrator on assignment," she was replaced as principal of her previous school by another individual, and she remained on paid administrative leave for nearly one year before resigning to accept a position with a different employer. The following sections recount these events in more detail and set out both Plaintiff's and Defendant's arguments regarding their legal import.

### B.  Plaintiff's History of Employment with Defendant

Defendant is a school corporation under Indiana law located in South Bend, Indiana. [DE 54 at 1, ¶ 1]. Plaintiff Tiana Batiste-Waddell ("Batiste-Waddell") began her employment with SBCSC in January 2000 as a permanent substitute. [DE 54 at 1, ¶ 2].

On March 20, 2018, Batiste-Waddell accepted the offer from SBCSC to serve as the principal of Jackson Middle School ("Jackson") beginning July 1, 2018. [*Id.* at 1, ¶ 3]. She served as principal of Jackson during the 2018-2019, 2019-2020, and 2020-2021 school years. [*Id.* at 2, ¶ 4]. Between 2018 and 2021, Batiste-Waddell was supervised by Karla Lee, Brandon White ("White"), and Diamond Robinson ("Robinson"). [*Id.* at 2, ¶ 5-7]. Only White and Robinson supervised Plaintiff during the 2019-2020 and 2020-2021 school years. [DE 54-2 at 8-9]. White was originally hired as Director of Curriculum and Instruction but also held a number of other titles during this time period. Diamond Robinson was hired as Director of School Leadership. [DE 54-20 at 4,6]. Evidence has not been submitted respecting Plaintiff's professional performance during the 2018-2019 school year. There is evidence reflecting Plaintiff's allegations regarding a number of allegedly harassing and/or discriminatory events that occurred during the 2018-2019 school year, but it was not set out in a manner compliant with the local rules (or at all, insofar as the details of these events were not included in Plaintiff's statement of facts) [DE 54-20 at 2-3].

### C.  Plaintiff's Performance During the 2019-2020 School Year

Within the first few months of the 2019-2020 school year, White received a number of complaints about Batiste-Waddell's tone and professionalism. [DE 54 at 2-3, ¶ 8]. White investigated the complaints by following up with the parents, students, and staff who made the complaints. [*Id.* at 3, ¶ 9]. Following the investigation, White determined there was sufficient evidence to substantiate the reported behavior, which he deemed inappropriate, particularly given Batiste-Waddell's leadership position with

the School Corporation. [*Id.* at 3, ¶ 10]. Accordingly, White issued a memorandum to Batiste-Waddell on October 14, 2019, with four directives pertaining to the maintenance of a professional environment and preferred ways of interacting with students, parents, and employees. [*Id.* at 3-4, ¶ 11]. Batiste-Waddell signed this document and acknowledged the directives contained therein. [*Id.* at 4, ¶ 12]. However, she disagreed with White's conclusions and directives and later responded accordingly in writing. [*Id.* at 4, ¶ 13].

Despite the October 14, 2019, directives to Batiste-Waddell to improve her communications with staff, parents, and students, SBCSC continued to receive more complaints about her communication, professionalism and judgment throughout the Fall and Winter of 2019. [DE 54 at 4, ¶ 14]. When several complaints were submitted close in time in early December 2019, White summarized the complaints, shared them with Batiste-Waddell in an email, and asked Batiste-Waddell to follow up on the complaints and inform him of the outcome. [*Id.* at 5, ¶ 18]. On February 27, 2020, White shared summaries of another set of complaints with Batiste-Waddell in an email, which Batiste-Waddell acknowledges having received. [*Id.* at 6, ¶ 25]. One additional parent complaint was made between the sending of that email and the closure of the school in response to the COVID-19 pandemic in March 2020. [*Id.* at 6, ¶ 27].

On July 22, 2020, Robinson met with Batiste-Waddell to let her know that she, along with White, would be providing support and supervision to Batiste-Waddell during the 2020-2021 school year. [*Id.* at 7, ¶ 28]. During this meeting, Batiste-Waddell stated she had several concerns that had not been addressed the previous year, and that

she had needed to get a lawyer because of this. [*Id.* at 7, ¶ 29]. Batiste-Waddell asked why White was included in an email about the budget and then stated that, since Robinson copied White on the email, Batiste-Waddell's trust (in Robinson) had been broken. [*Id.* at 7, ¶ 30]. Batiste-Waddell also stated that she was watching the SBCSC closely for fairness, that White had written her up during the last school year without providing details about what she did wrong, and that she felt that White was shirking his responsibilities by having Robinson co-supervise her [DE 54 at 7, ¶ 31]. In response to these concerns, Robinson explained that her goal was simply to support Batiste-Waddell in providing leadership to Jackson. [*Id.* at 7, ¶ 32]. Robinson also explained that she expected Batiste-Waddell to develop an action plan to address the following three areas of concern: (1) Jackson's overall school grade of "F"; (2) disproportionality in discipline among economically disadvantaged male students of color at the school; and (3) the number of parent complaints received by the school. [*Id.* at 7, ¶ 33]. When Robinson asked Batiste-Waddell when she thought she could reasonably have an action plan prepared, Batiste-Waddell "chuckled" and said she had other important things to do but that she thought she could complete it by the end of August 2020. [*Id.* at 8, ¶ 34]. Robinson explained the plan should be prepared prior to the start of the new school year and gave Batiste-Waddell a deadline of August 5, 2020. [*Id.*]. It is unclear whether Plaintiff completed and submitted this report by the deadline.

Following Robinson's meeting with Batiste-Waddell, White provided Batiste-Waddell school-specific data regarding disproportionalities in student suspensions and parent concerns. [*Id.* at 8, ¶ 35]. White's July 22, 2020, email on this subject also included

a detailed listing of the complaints SBCSC had received regarding Jackson Middle School and Batiste-Waddell from August 15, 2019 through March 11, 2020. [*Id.* at 8, ¶ 36]. According to White, compared to the other school building leaders in South Bend, Batiste-Waddell had received a disproportionate number of complaints from parents and employees. [*Id.* at 8, ¶ 39].

### D.  Plaintiff's Performance During the 2020-2021 School Year

In August 2020, a sixth-grade teacher at Jackson contacted White with concerns about Batiste-Waddell's professionalism. [DE 54 at 8, ¶ 37]. The allegations included inappropriate comments and conversations, racially charged comments, unprofessional text messages, and a lack of boundaries. [*Id.* at 8, ¶ 38]. On December 15, 2020, another employee, Jackson special education teacher Erica Lopez ("Lopez"), contacted White and Jason Zook ("Zook"), then the Director of Talent Management/IUSB PLUS Grant, complaining that Batiste-Waddell barged into her classroom, yelled at her students for not having their masks on, and stated "I will not get fired for you all." [*Id.* at 8-9, ¶ 40]. Lopez wrote in her complaint that some of the students were indeed not wearing masks but noted that this was because of their disabilities. [*Id.* at 9, ¶ 40]. Lopez stated she believed it would have been more appropriate for Batiste-Waddell to communicate her concerns privately so Lopez could have had the opportunity to explain discreetly why some students did not wear masks. [*Id.*] Zook and White investigated Erica Lopez's complaint, and while the witnesses had differing perspectives on whether Batiste-Waddell spoke sternly, raised her voice, was hostile, and/or yelled, White determined

she clearly should have handled the situation more delicately, particularly in light of the unique needs of the students involved. [*Id.* at 9, ¶ 41].

In December 2020, Batiste-Waddell received her mid-year evaluation. [*Id.* at 9, ¶ 42]. There were ten (10) areas on which she was evaluated. *Id.* For each, the possible ratings were "Highly Effective," "Effective," and "Improvement Necessary." [DE 54 at 9, ¶ 42]. She received "Highly Effective" ratings in three (3) of the ten (10) areas: "Plans data driven decision making" [sic]; "Develops systems to support operations and management"; and "Manages school operations and resources for student academic success and well-being." [*Id.*] She received "Effective" ratings in four (4) areas: "Implements the school's mission, vision, and core values in all aspects of leadership"; "Creating equitable and culturally responsive systems" [sic]; "Develop systems of support for curriculum, instruction and assessment" [sic]; and "Impacts the processional community through collaborative examination of practice" [sic]. [*Id.* at 9-10, ¶ 42]. Finally, she received an Improvement Necessary rating in the following three (3) areas relating to "Ethics and Professional Norms" [sic]: "Creating a culture of ethical and professional behavior," "Sustaining systems of ethical and professional behavior," and "Impacts of ethical and professional behavior" [sic]. [*Id.* at 10, ¶ 42].

When White met with Batiste-Waddell to discuss her evaluation, he told her she could be successful but needed to work on her communication and interpersonal skills. [*Id.* at 10, ¶ 44]. Despite having been determined to be "Highly Effective" or "Effective" in seven (7) out of ten (10) areas, Batiste-Waddell discussed with White and Robinson that she had not been provided evidence to explain the lower ratings. [*Id.* at 10, ¶ 43].

She also provided information regarding professional development completed, and, after considering her input, White made an upward adjustment in an instruction area of her evaluation. [*Id.* at 10, ¶ 44]. The "Improvement Necessary" notations in the evaluation, and the comments shared with her during the meeting, were communicated for the sole purpose of helping Batiste-Waddell improve her performance and effectiveness as building leader, and the performance evaluation did not impact Batiste-Waddell's compensation or the terms of her employment in any way. [DE 54 at 10, ¶ 44].

### E.  Plaintiff's Placement on Paid Administrative Leave in February 2021

In February 2021, the School received another complaint from a staff member about Batiste-Waddell's professionalism from Naomi Adams ("Adams"), who was a social worker at Jackson. [*Id.* at 10, ¶ 45]. On February 18, 2021, Zook and Robinson went to discuss the matter with Batiste-Waddell and place her on paid administrative leave, it being SBCSC's regular practice to place an administrator on paid leave to investigate complaints or other allegations that, if proven true, could result in discipline [*Id.* at 11, ¶ 46-47].

According to Robinson and Zook, after being notified of her placement on administrative leave, Batiste-Waddell became erratic and angry and began using profanity: Zook described her as cussing and yelling. Robinson recounted Plaintiff becoming increasingly hostile, slamming things around, shoving items in her backpack, pacing back and forth around her office, shouting at Zook and Robinson, and repeatedly circling around the room to get things from the closet while knocking

things over on her desk. [*Id.* at 11, ¶ 48-50]. In addition, multiple witnesses reported hearing Batiste-Waddell use the school's public announcement system to call for assistance from the building's behavioral interventionist. [DE 54 at 12, ¶ 52]. According to Diamond Robinson, Batiste-Waddell's conduct caused her to feel unsafe and threatened and to fear for her safety. [DE 54-17 at 2]. Batiste-Waddell, by contrast, asserts that she was simply collecting her things from her desk, accidently knocked over a pencil holder, walked around her desk to her coat closet to put her coat on, and told Robinson and Zook, "You know, you guys are targeting me, you're targeting me." [*Id.* at 11-12, ¶ 52].

Jason Zook maintains he directed Batiste-Waddell to submit to a drug test because of the above behaviors. [*Id.* at 12, ¶ 53-54]. SBCSC maintained a policy and administrative guideline that addressed substance abuse, and a portion of the substance abuse administrative guideline states, "Should a supervisor determine from a physical aspects, appearance, or behavior of a professional staff member that s/he might be under the influence of other drugs, said professional staff member shall be immediately taken to a local health facility for further diagnosis."[*Id.* at 12, ¶ 57]. Upon directing Batiste-Waddell to submit to a drug test, Zook asked School Resource Officer ("SRO") Pacheco to escort Batiste-Waddell to the drug screen, as it had been SBCSC's practice to have a police escort when employees were sent for a drug test. [*Id.* at 12, ¶ 55-56]. SRO Pacheco declined and informed Zook that the South Bend Police Department's officers were no longer escorting SBCSC employees to drug screenings, and Batiste-Waddell did not complete a drug test as directed. [*Id.* at 12-13; ¶ 56, 58].

Plaintiff contests Zook's account of her behavior, his rationale for ordering a drug test, and his characterization of her response to this order for a drug test, but, as was explained above, she does not do so in a manner in accordance with the local rules. [DE 58 at 3, 6].

On February 21, 2021, after having been placed on administrative leave, Batiste-Waddell emailed a nine-page complaint to Brian Kubicki, SBCSC's general counsel at the time. [*Id.* at 13, ¶ 59]. The complaint contained wide-ranging allegations of harassment, discrimination and retaliation against six (6) individuals (five (5) SBCSC employees, one (1) non-employee) dating back to July 2018. [DE 54 at 13, ¶ 60]. Batiste-Waddell characterized the actions underlying her complaints as "microaggressions, direct aggression, passive aggression, blatant disregard for past practice, harassment, and a disregard for [her] as a human being," and suggested the treatment was based on her status as a "black woman in leadership." [*Id.*] In response to the complaint, SBCSC engaged outside legal counsel to investigate Batiste-Waddell's concerns. [*Id.* at 13, ¶ 61].

Neither the investigation of Batiste-Waddell's concerns nor the investigation of the allegations against her was completed by the time administrative assignments were to be made for the 2021-2022 school year. [*Id.* at 13, ¶ 62]. At that time, White determined Batiste-Waddell would be reassigned to serve as an administrator on assignment at Rise-Up Academy for that year, and that Kenard Robinson, an African American male, would fill the Jackson Middle School principal position for the 2021-2022 school year. [*Id.* at 13, ¶ 63]. The administrator on assignment position at Rise-Up

Academy is an administrator position in the district, with the same compensation and benefits as a principal and equivalent responsibilities and opportunities for growth and advancement. [DE 54 at 13, ¶ 63]. According to Brandon White, he made this decision because, in April 2021, decisions needed to be made regarding building leadership at Jackson Middle School (and elsewhere in the district), because Batiste-Waddell's continued employment in the district was uncertain (based on her conduct on February 18, 2021, and her previous performance issues), and because neither the investigation of Batiste-Waddell's concerns nor the investigation of the allegations against her (including her conduct on February 18, 2021) was complete. [*Id.*].  Batiste-Waddell's administrator's contract was not recommended for non-renewal. [*Id.* at 16, ¶ 77].

Batiste-Waddell was on paid administrative leave from February of 2021 until she resigned to become the Principal in Residence at Phalen Leadership Academies. [*Id.* at 14, ¶ 65]. When she was on paid administrative leave with SBCSC, she was paid $92,000 per year. [*Id.* at 14, ¶ 66]. When she was reassigned as an administrator on assignment, she saw no reduction in pay or benefits. [*Id.*]. Upon leaving SBCSC to work for Phalen Leadership Academies, Batiste-Waddell continued to be paid $92,000 per year. [*Id.* at 14, ¶ 67]. After three months at Phalen Leadership Academies, Batiste-Waddell left Phalen to become the Chief Academic Officer at Benton Harbor Area Schools, where her annual salary is now $126,000. [*Id.* at 15, ¶ 68].

On August 10, 2021, Batiste-Waddell filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging race discrimination and

retaliation between the dates of February 18, 2021 and April 20, 2021. [*Id.* at 14, ¶ 64].

Batiste-Waddell amended her charge on September 12, 2021, to include allegations of

gender/sex discrimination and hostile work environment. [*Id.*]. Batiste-Waddell

alleges Jenny Mast and Chris Berg were individuals who were similarly situated to,

yet treated differently than, herself. [*Id.* at 15, ¶ 70]. In her response to Defendant's

Motion, she has not named any others as people who were likewise similarly situated

but differently treated. [*Id.*].

Jennie Mast is a White female and former SBCSC principal. [DE 54 at 15, ¶ 72-73].

She was put on administrative leave in February 2021, as part of SBCSC's investigation

into the provision of special education services to students within her building. [*Id.*].

On February 12, 2021, Jennie Mast received a letter of written reprimand and notice of

reassignment to an administrator on assignment position. [*Id.* at 15, ¶ 74]. She was told

to report as an administrator on assignment on February 17, 2021, and she remained in

that position until June 30, 2021. [*Id.*]. In a letter dated March 1, 2021, Jennie Mast was

informed that the School Board of Trustees had decided not to renew her

administrator's contract and that her nonrenewal would be effective June 30, 2021. [*Id.*

at 15-16, ¶ 75-76]. In that letter, Ms. Mast was also informed that she could apply for

open administrative positions but that, if she did not apply for any open

administrative positions or was not selected for one, she would be reassigned to a

teaching position with an appropriate salary reduction. [*Id.* at 16, ¶ 76]. Her

administrator's contract was not renewed. [*Id.* at 16, ¶ 77].

Christopher (Chris) Berg was a principal at Clay High School. [*Id.* at 16, ¶ 78]. A teacher in Chris Berg's building was disciplined for violating school policy on outside speakers. [*Id.* at 16, ¶ 79]. Chris Berg did not himself violate SBCSC's policy on outside speakers and was not placed on administrative leave. [*Id.*]. He was neither accused of conduct nor the subject of complaints that would have triggered investigatory leave. [*Id.*].

## II.    SUMMARY JUDGMENT STANDARD

A party moving for summary judgment, here Defendant, bears the burden of demonstrating that the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A "genuine issue" exists regarding a material fact when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir. 2003). Accordingly, the Court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and

one task only: to decide, based on the evidence of record, whether there is a material dispute that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, the court is not "obligated to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

While the moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record, if any, which it believes demonstrate the absence of a [genuine issue of] material fact, there is nothing in Rule 56 that requires a moving party to negate an essential element of an opponent's claim for which the opponent will bear the ultimate burden at trial." *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir.1996) (citing *Celotex Corp. v. Catrett,* 477 U.S. at 323). Rather, the standard for granting summary judgment requires the district court to grant summary judgment if the record "could not lead a rational trier of fact to find for the non-moving party." *McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789, 796 (7th Cir. 1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). The burden is therefore on the non-movant to set forth "specific facts showing that there is a genuine issue for trial" regarding elements where she has the ultimate burden of proof for trial. *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir. 1998) (quoting Fed. R. Civ. P. 56(e)).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the allegations or denials contained in her pleadings. Rather, the nonmoving party

must present sufficient evidence to show the existence of each element of her case on which she will bear the burden at trial. *Celotex*, 477 U.S. at 322-23; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). "Sworn affidavits, particularly those that are detailed, specific, and based on personal knowledge are 'competent evidence to rebut [a] motion for summary judgment.'" *Kaba v. Stepp*, 458 F.3d 678, 681 (2006) (quoting *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) (*per curiam*)). "'Most affidavits are self-serving, as is most testimony, and this does not permit a district judge to denigrate a plaintiff's evidence when deciding whether a material dispute requires trial.'" *Id.* (quoting *Wilson v. McRae's, Inc.*, 413 F.3d 692, 694 (7th Cir. 2005)). But where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

## III. DISCUSSION

### A. Procedural Deficiencies with Plaintiff's Response

Defendant moved for summary judgment on May 31, 2024. [DE 52]. Under this Court's local rules[1], a party moving for summary judgment must separately file: (1) a

---

[1] The applicable rules became effective on February 25, 2022, a little over a two years before the instant motion was filed.

motion; (2) a supporting brief; and (3) a statement of material facts with numbered paragraphs for each material fact the moving party contends is undisputed which includes (A) a short statement of each fact; and (B) a citation to evidence supporting each fact. *See* N.D. Ind. L.R. 56-1(a). Defendant's summary judgment filings comport with these rules, thus meeting its obligation as the moving party. [*See* DE 52 (motion); DE 53 (supporting brief); and DE 54 (statement of material facts)].

Plaintiff responded on July 28, 2024, after requesting and receiving an extension. [DE58]. Under this Court's local rules, a party opposing summary judgment must separately file: (1) a response brief and (2) a Response to Statement of Material Facts that (A) restates verbatim the Statement of Facts, (B) includes a correspondingly numbered response immediately following each paragraph of the Statement of Facts, (C) cites to evidence supporting each dispute of fact, and (D) includes additional facts in a section titled Additional Material Facts with numbered paragraphs continuing the sequential numbering of the Statement of Material Facts for each additional material fact the opposing party contends is undisputed which includes both (i) a short statement of each fact, and (ii) a citation to evidence supporting each fact. *See* N.D. Ind. L.R. 56-1(b).[2]

Plaintiff does include a "Brief in Opposition" as contemplated by N.D. Ind. L.R. 56-1(b)(1). [*See* DE 58]. But Plaintiff's response ignores the requirements listed in N.D.

---

[2] The rule applies when an opposing party is represented by counsel—and Plaintiff has been represented by counsel during the course of this case. *See* N.D. Ind. L.R. 56-1(b)(3) (exempting *pro se* parties from this requirement).

Ind. L.R. 56-1(b)(2). Instead of including a separately filed Response to Statement of Material Facts as required by N.D. Ind. L.R. 56-1(b)(2), Plaintiff's Brief in Opposition includes a "Statement of Material Facts" that contains 68 numbered paragraphs purporting to outline material facts in dispute. [DE 58 at 1-10]. Further, Plaintiff's Designation of Evidence in Support of Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment [DE 59], does not "restate[] verbatim the [Defendants'] Statement of Facts" nor does it include "a correspondingly numbered response immediately following each paragraph of the Statement of Facts" or a citation to evidence supporting each dispute of fact. *Id.* Plaintiff's Designation thus also fails to include a list of additional facts in a section titled Additional Material Facts as required. Thus, Plaintiff has not met her obligations as the nonmoving party under the local rules.[3]

Defendant raises these procedural deficiencies in its reply brief and requests that the Court treat all facts in its Statement of Material Facts [DE 63] as undisputed due to these deficiencies. As Defendant suggests, "[t]he district court is entitled to require strict enforcement with its local rules." *McCormick v. Goebel*, 655 F. Supp. 3d 748, 756 (N.D. Ind. 2023)(citing *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015). The Court included these requirements in the local rules because they facilitate the Court's

---

[3] The Court notes that Defendant filed [response to paras 1-68] in a separate document which complies with N.D. Ind. L.R. 56-1(c)(2). There, the Plaintiff should have been alerted to the deficiency of her own briefing as to her response to Defendant's statement of material facts. Plaintiff did not seek to correct her deficiency, as demonstrated by her August 28, 2024, filing [DE 66] which was stricken by this Court as improper. [DE 67]. She also squandered her opportunity to further amend her deficiency, despite that the Court granted her leave to do so until September 6, 2024. [DE 67].

ability to efficiently and justly resolve motions for summary judgment. Thus, parties' "[c]ompliance with these rules demonstrates respect for the process." *Robertson v. Marthakis*, No. 3:22CV887 DRL-AZ, 2025 WL 1784690, at *5 (N.D. Ind. June 25, 2025). When a party fails to comply with the local rules, the Court must then wade through a long record to find disputes of fact. But "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991); *see also Litsinger v. Forest River, Inc.,* 536 F. Supp. 3d 334, 353 (N.D. Ind. 2021) (stating that "it isn't the court's job to find the needle in the haystack, the truffle in the field, or the Waldo on the page"). Accordingly, a non-moving party's failure to admit or deny facts as presented in the moving party's statement of facts "render[s] the facts presented by the moving party as undisputed." *Curtis*, 807 F.3d at 218-19; *see also* Fed. R. Civ. P. 56(e) ("If a party ... fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ....").

Thus, the Court must determine whether to treat Defendants' Statement of Material Facts as undisputed here.

Plaintiff was afforded an extension of time before ultimately responding in opposition to summary judgment on July 28, 2024. [DE 56, DE 58]. This suggests that the deficiency did not stem from a lack of time. Rather, it suggests a lack of awareness of the court's rules at the time the response was filed. Even so, Defendant's reply brief raised the deficiencies with Plaintiff's response, and Plaintiff did not seek leave to address the deficiencies. What's more, Plaintiff later filed a surreply as a result of

18

Defendant's Response to her statement of additional material facts, but this surreply does not acknowledge the deficiencies or seek to supplement her response to correct the problems. Based on these circumstances, as well as Plaintiff's total failure to comply with the rules, the Court can only consider the facts listed by Defendant in their Statement of Material Facts [DE 46, ¶¶ 1-79] as undisputed, consistent with other courts in this district. *See* Fed. R. Civ. P. 56(c); *Szczepanski v. Dana, Inc.*, No. 1:22-CV-00318-GSL, 2024 WL 3594693, at *1 fn. 1 (N.D. Ind. July 31, 2024)(accepting the moving party's Statement of Facts as true where the non-moving party—represented by Plaintiff's same counsel here—"ma[d]e no attempt to comply with Fed. R. Civ. P. 56 or N.D. Ind. L.R. 56-1(b)"); *Buckley v. S.W.O.R.N. Prot. LLC*, No. 20-CV-357, 2022 WL 4598577, at *1 (N.D. Ind. Sept. 30, 2022) (same); *but see Downey v. Hyatte*, No. 3:21-CV-131-SJF, 2025 WL 901559, at *2 (N.D. Ind. Mar. 25, 2025) (granting other counsel leave to amend his response to a motion for summary judgment when counsel's original response did not comply with N.D. Ind. L.R. 56-1(b)).

### B.  Merits Analysis

#### i.  Plaintiff's Title VII and § 1981 Claims

Plaintiff brings her race and sex discrimination claims under Title VII, Title 42 U.S.C. § 2000e–2(a) and 42 U.S.C. § 1981.  Title VII prohibits employers from discriminating against their employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a).

Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same
> right in every State ... to make and enforce contracts ... as is enjoyed by white
> citizens [and this right includes] the making, performance, modification,
> and termination of contracts, and the enjoyment of all benefits, privileges,
> terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(a)-(b), as amended by the Civil Rights Act of 1991. Section

1981 guarantees all people the same right to make and enforce contracts, including

contractual aspects of employment like hiring, firing, the terms of employment, and

protections against retaliation.

"The legal analysis for discrimination claims under Title VII and § 1981 is

identical." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019)

(citing *Ferrill v. Oak Creek–Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017)).

Therefore, it is proper to merge the analysis of Plaintiff's claims under the two statutes.

*McCurry*, 942 F.3d at 788.

A plaintiff that brings race and sex discrimination claims under Title VII and

Section 1981 can survive summary judgment by raising a genuine issue of material fact

that the adverse employment action was motivated by a discriminatory purpose. A

plaintiff can prove discrimination through either the direct method or an indirect

method, known as the *McDonnell Douglas* burden-shifting test. *Rozkowiak v. Village of

Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005).

The direct method requires the plaintiff to simply present evidence satisfying the

elements of the retaliation claim: (1) she engaged in a protected activity, (2) she suffered

an adverse action, and (3) a causal connection exists between the activity and the

adverse action. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). *Sitar v. Ind. Dep't. of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003).

The indirect method established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, involves a burden-shifting framework "for evaluating disparate treatment claims that rest on circumstantial evidence." *Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1544 (2025). That method allows the plaintiff to establish a *prima facie* case without proving a direct causal link by showing that: (1) she is a member of a protected class; (2) she performed her job duties according to her employer's legitimate expectations; (3) she suffered an adverse action; and (4) similarly situated employees outside of her protected class were treated more favorably. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *Lewis*, 909 F.3d at 866; *Anderson v. Street*, 104 F.4th 646, 652 (7th Cir. 2024).

If Plaintiff successfully establishes a prima facie case for discrimination under *McDonnell Douglas*, then the burden shifts onto the Defendant to "articulate[] a legitimate, nondiscriminatory reason for the adverse employment decision." *Anderson*, 104 F.4th at 653 (quoting *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015)). Once this is done, "the burden then shifts back to Plaintiff to demonstrate that Defendant['s] stated reason for firing her was pretextual." *Id.* Notably, that final burden "requires demonstration by a preponderance of the evidence that the [Defendants'] stated reasons for [Plaintiff's] firing were *false*, not that they were unfair or baseless." *Id.*

Regardless of the method used, the evidence that plaintiff brings must be evaluated "as a whole to determine if it 'would permit a reasonable factfinder to

conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Lewis*, 909 F.3d at 867 (quoting *Ortiz v. Werner Enterprises*, 834 F.3d 760, 764-65 (7th Cir. 2016)). *Ortiz* does not reject or alter the *McDonnell Douglas* burden-shifting framework, but instead clarified that separate classifications of evidence did not exist regardless of whether Plaintiff sought to prove discrimination using the direct or indirect methods. *Id.* "Nothing in *Ortiz* . . . displaced the burden-shifting analysis established in *McDonnell Douglas*." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017). Plaintiff has chosen to make her argument regarding her sex and race discrimination claims through the lens of *McDonnell Douglas*, as does Defendant. The Court will employ that framework as well.

### 1. Plaintiff's Sex Discrimination Claims

 In its reply brief, Defendant argues that because Plaintiff failed to address its arguments supporting summary judgment regarding her sex discrimination and hostile work environment claims in her response or present any evidence to support her claims of sex discrimination and sex-based hostile work environment, Plaintiff has waived those claims. Defendant is correct that the consequence of failure to present a claim in one's district court brief in opposition to summary judgment is that the claim will be deemed abandoned. *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003); *see also Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999).

In her complaint, Plaintiff claimed that Defendant "retaliate[ed] against Plaintiff based on gender for engaging in protected activity," "discriminat[ed] against Plaintiff

due to her gender," and "create[ed] a harassing and hostile work environment based on Plaintiff's gender." [DE 1 at 4-5, ¶ 53-58]. Defendant, in its brief in support of its motion for summary judgment, made arguments responsive to these claims. [DE 53]. Yet Plaintiff's brief in response to Defendant's motion does not specifically address these arguments or the sex- or gender-specific nature of the claims to which they relate, beyond titling one text header, "Legal Standard for Race Discrimination Under Title VII...and Her Gender in Violation of Title VII" (and not elaborating upon the latter aspect in the paragraphs following). Further, when it comes to the discrimination claim in particular, in addition to failing to make explicit at any point how any adverse treatment Plaintiff may have suffered was connected to her sex or gender, as opposed to her race alone, Plaintiff's responding brief lists only one person as being similarly situated but better treated than Plaintiff, and that person is a woman. This failure to present evidence bolstering Plaintiff's sex-based claims, along with the presentation of evidence that seems to undermine them, makes it difficult for the Court to determine whether Plaintiff has elected to carry these claims through the summary judgment stage.

Defendant argues that "Waddell's failure to respond to SBCSC's arguments means she 'implicitly acquiesced in defendant's position,'" and it submits binding precedent in support of this contention. Thus, although it would have given Plaintiff's sex-based claims the same consideration as the others in her complaint had Plaintiff pursued them in her briefing, the Court now regards these claims as moot and will

proceed directly to consideration of Plaintiff's race-based discrimination, hostile work environment, and retaliation claims.

### 2. Plaintiff's Race-Based Discrimination Claims Under *McDonnell Douglas*

The Court now applies the *McDonnell Douglas* framework to Plaintiff's race-based discrimination claims under Title VII and Section 1981. The parties do not dispute that Plaintiff, as an African-American woman, is a member of a protected class. Therefore, element one exists. The parties do dispute whether Plaintiff can meet her burden in regards to the remaining three elements, that is: whether she was meeting Defendant's legitimate employment expectations; whether she suffered adverse action; and whether similarly situated employees outside of her protected class were treated more favorably than she was. *McDonnell Douglas Corp.*, 411 U.S. at 802.

As stated, Plaintiff must meet her burden of showing that a triable issue of material fact regarding all four elements exists in order to establish a prima facie case of discrimination. *See DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797-98 (7th Cir. 1995); *Cox v. Coca-Cola*, 191 F. Supp. 3d 909, 917 (S.D. Ind. 2016) (internal citations omitted).

Based on the rationale outlined below, the Court finds that Plaintiff has neither proved nor created a genuine issue of fact on any of these disputed elements. Therefore, there is no need for the Court to conduct an analysis on whether Defendant's actions were based on legitimate, non-discriminatory reasons as to these claims.

The Court begins with the second element. The second element that Plaintiff must show is that she was meeting Defendant's legitimate employment expectations.

24

"The proper inquiry mandates looking at [Plaintiff's] job performance through the eyes of her supervisors at the time," here that means when Plaintiff was placed on administrative assignment. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574 (7th Cir. 2021) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008)). "The question is not whether the [employer's performance] ratings were *right* but whether the employer's description of its reasons is *honest*." *Id.* (citing *Gustovich v. AT & T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) and *Dickerson v. Bd. of Trs. Of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011) ("[A]lthough [plaintiff] disagreed with his [employer's] negative evaluations, that does not mean that the evaluations were the result of unlawful discrimination.").)

Defendant, in its brief in support of its motion for summary judgment, argues that Plaintiff cannot meet the legitimate expectations prong, pointing to the various complaints about Plaintiff's behavior that Defendant received from parents and school staff members throughout 2019, 2020, and the beginning of 2021. According to Defendant, Plaintiff's conduct continued to amass a disproportionate number of complaints. Plaintiff therefore ran afoul not only of a baseline expectation for administrators to conduct themselves in a professional manner but also of specific directives issued by her supervisors to alert her to areas in which she needed to improve.

Defendant also notes that "the Seventh Circuit has affirmed numerous times that a demonstrated history of disrespectful and abrasive communications generally defeats an employee's efforts to demonstrate that she was meeting her employer's legitimate

25

expectations." *Carragher v. Indiana Toll Rd. Concession Co.*, 936 F. Supp. 2d 981, 989 (N.D. Ind. 2013). Defendant cites additional cases emphasizing that completion of assignments or satisfactory performance of *some* aspects of a job will not establish, in themselves, that an employee was meeting expectations where there is also evidence of attitudes or communications that, by way of their disrespect or abrasiveness, fail to meet that bar. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir.2004).

Plaintiff, in response, relies solely on her December 2020 mid-year evaluation and does not address Defendant's arguments regarding complaints about her professionalism from students' parents and her subordinates. She argues that Defendant admits that "Batiste-Waddell's evaluation was more positive than it was negative," and that "[s]he was rated Highly Effective or Effective in seven of the ten areas of evaluation," and additionally, that "the Improvement Necessary notations were communicated for the sole purpose of helping Batiste-Waddell improve." Accordingly, Plaintiff contends, Defendant admits that Batiste-Waddell was meeting its legitimate expectations. It bears noting at the outset that, while Defendant does not dispute the latter two claims in this list, Defendant seemingly does dispute the first claim in its response to Plaintiff's statement of facts, as Defendant there denies the validity of "any inference that Waddell was meeting SBCSC's legitimate performance expectations." [DE 64 at 3, ¶ 9]. This is set out in Defendant's reply brief: "The Improvement Necessary ratings," argues Defendant, "illustrate SBCSC expected immediate improvement in these areas . . . The evaluation tool was intended to help Waddell improve her

performance and effectiveness as a building leader *because* she was not meeting those expectations."

In light of the precedent Defendant has cited, Defendant has the prevailing argument. While Plaintiff's performance review may not, in and of itself, have had immediate consequences for her continued employment, it was clearly reflective of her employer's assessment of her work at the time it was issued. Unquestionably (given the use of the words "improvement *necessary*" in the ratings themselves), that assessment included a belief that Plaintiff *needed* to improve in several areas, including areas related to communication and interpersonal skills. Plaintiff continued to receive complaints for conduct related to these areas, which the Court concludes is evidence of failure to improve upon and perform essential aspects of her position. Plaintiff has cited no legal precedent or made any alternative argument on which the Court could find that there exists a dispute of a genuine issue of material fact with respect to Plaintiff's meeting Defendant's legitimate expectations. Thus, Plaintiff has failed to show a required element of her discrimination claim.

The Seventh Circuit has acknowledged that *McDonnell Douglas* "is not particularly helpful in organizing the evidence where the main issue is the plaintiff's job performance." *Khungar*, 985 F.3d at 574. When the issue of satisfactory job performance comprises the heart of the parties' dispute and "'must be analyzed in detail at multiple stages of the *McDonnell Douglas* test,' it is often 'simpler to run through that analysis only once.'" *Id*. at 574-75 (quoting *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th

Cir. 2002); *accord Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477-78 (7th Cir. 2010); *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008)).

At the heart of this dispute are the questions of whether Plaintiff performed poorly and whether that poor performance caused her termination. The Court having determined that no reasonable trier of fact could decide that Plaintiff was meeting her employment expectations, no analysis of the other elements is necessary.

Accordingly, because the Court finds that Plaintiff cannot meet of burden of showing that an issue of material fact exists as to whether she was meeting Defendant's legitimate employment expectations, and so cannot show prima facie discrimination under *McDonnell Douglas*, it is not necessary for the Court to conduct analysis on whether Defendant provided legitimate, non-discriminatory rationale for its actions. Summary judgment is proper for Defendant on these claims.

### ii. Plaintiff's Race-Based Hostile Environment Claim

Like discrimination claims, claims of hostile work environment brought "under Title VII and [under] § 1981 are analyzed in the same manner." *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814 (7th Cir. 2022). In order to demonstrate the existence of a hostile work environment, a plaintiff must show: (1) she was subject to unwelcome harassment, (2) the harassment was based on an unlawful reason, (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment, and (4) there is a basis for employer liability. *See Smith v. Illinois Dept. of Transp.*, 936 F.3d 554, 560 (7th Cir. 2019). Importantly, the plaintiff needs to produce evidence sufficient to create a genuine issue of material fact

with regard to all four elements in order survive summary judgment. See *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). Because the two statutes are analyzed in the same manner "case law addressing one type of claim applies to both types" *Paschall*, 28 F.4th at 814 (citing *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).)

"To support a hostile work environment claim, the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose." *Yancick*, 653 F.3d at 544. "Although a connection between the harassment and the plaintiff's protected class need not be explicit, there must be *some* connection, for "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority.'" *Cole*, 838 F.3d at 896 (quoting *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014)). "Nevertheless, forms of harassment that might seem neutral in terms of race ... can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." *Id.* (citing *Landrau–Romero v. Banco Popular de Puerto Rico*, 212 F.3d 607, 614 (1st Cir. 2000)).

Defendant argues that Plaintiff was not subject to unwelcome harassment. To show unwelcome harassment, a plaintiff must point to conduct that an "objectively reasonable person" would find offensive. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993). The plaintiff must also show that subjectively, the conduct was unwelcome because she "did not solicit or incite it" and that she "regarded the conduct as

undesirable or offensive." *Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir. 1982). Here, although Plaintiff points to a myriad of instances that she finds personally offensive, she fails to define or support her harassment claim.

Defendant argues that Plaintiff alleges no specific instances of unwelcome harassment in her complaint, and that in her deposition, the only facts that Plaintiff identified as unwelcome harassment were that several of her emails had not been responded to and that there were staffing shortages in her building. Defendant further argues that none of the actions that Plaintiff identified as discriminatory, her performance evaluation, failure to improve in regards to her professionalism, and the reaction to her actions once she learned that she was being placed on administrative leave, constituted unwelcome harassment. Plaintiff argues that the harassing conduct was unwelcome because she complained about the conduct, after which she was not afforded a meeting before being placed on administrative leave. Plaintiff argues that Defendant's action deprived her of due process and further that being placed on leave for eleven months prior to resigning constitutes harassment. Plaintiff, in effect, contends that naming conduct as harassing is sufficient for it to be deemed as such.

In determining whether an environment is objectively hostile or abusive, the Supreme Court has directed courts to look at the totality of the circumstances, including:

> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998); *Russell v. Board of Trustees of University of Illinois at Chicago,* 243 F.3d 336, 342-43 (7th  Cir. 2001). Courts have consistently held that offhand comments and isolated incidents do not amount to discriminatory changes in an employee's terms and conditions of his or her employment unless they are extremely serious in nature. *Faragher,* 524 U.S. at 786, *citing Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81 (1998); *White v. The Money Store,* 142 F.3d 441, 1998 WL 124062, at *6 (7th Cir. March 17, 1998), *citing McKenzie v. Illinois Dept. of Transportation,* 92 F.3d 473, 479 (7th Cir. 1996) (noting that "isolated and innocuous incidents will not support a hostile environment claim"). Plaintiff has not pointed to conduct that would rise to this objective standard and has failed to outline the corresponding required pervasiveness.

The Court now addresses the second prong, whether Plaintiff can show any alleged unwelcome harassment was based on an unlawful reason. Defendant argues Plaintiff's "harassment claim fails at the outset because she cannot demonstrate that any of the actions about which she complains were taken based on her race and/or gender." Defendant cites to a number of cases calling attention to the fact that, because "Title VII protects against discrimination, nor personality or juvenile behavior," *Brown v. Advocate S. Suburban Hosp.,* 700 F.3d 1101, 1105 (7th Cir. 2012), showing that purportedly harassing conduct was based on an unlawful reason is essential in a hostile work environment action. *See Smith*, 936 F.3d at 560. Defendant notes that, although courts do not require an "explicit" connection between alleged harassment and a plaintiff's protected class, "there must be some connection, for not

every perceived unfairness in the workplace must be ascribed to discriminatory motivation merely because the complaining employee belongs to a [] minority." *Cole v. Bd. of Trustees*, 838 F.3d 888, 896 (7th Cir. 2016). "Title VII," it says, "is not a general civility code for the workplace . . . it does not prohibit harassment in general," *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1086 (7th Cir. 2000), and Plaintiff (in Defendant's eyes) has not distinguished the alleged harassment she endured from this general harassment.

Plaintiff begins her response by citing precedent of her own: First, in her words, "[t]o support a hostile work environment claim, the plaintiff need not show that they complained of conduct that was explicitly racial, but must show it had a racial character or purpose." *See Yancik*, 653 F.3d at 544. Second, "[t]he connection between the harassment and the plaintiff's protected class need not be explicit, however, there must be some connection. *See Cole* 838 F.3d at 895-96. Third, "Forms of harassment that might seem neutral in terms of race . . . can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected class." *See Paschall*, 28 F.4th at 814.

Having laid this foundation, Plaintiff lists three respects in which she was allegedly treated less fairly than fellow employee Jennie Mast, seemingly to demonstrate that any difference in treatment was harassment based on Waddell's race (and gender, which was dealt with above). The listed concerns or forms of harassment are the opportunity to participate in due process mechanisms after placement on administrative leave, the opportunity to have a formal meeting with supervisors before

being placed on administrative leave, and the (comparative seriousness of the) reason for placement on leave.

In response to Plaintiff's argument, Defendant emphasizes the qualifications found in Defendant's own case citations, emphasizing that, as Defendant puts it, "simply pointing to situations in which an employee's situation differed from another's is not sufficient evidence to show that one's protected class is the cause of the harassment." *See Paschall*, 28 F.4th at 814. Defendant notes that, in *Paschall*, plaintiffs argued "they had to do harder jobs than white employees, were not allowed to bid for other jobs, were denied overtime or opportunities for bonuses, had to work as temporary employees longer than others did, and were generally treated more harshly than white employees," but that the court in that case found that the plaintiffs did not provide sufficient evidence to support the identified harassment was connected to their race. *Id.* Waddell, says Defendant, "appears to be making a similar argument: she asks the Court to conclude that differential treatment of a white counterpart equates to harassment because of race." Yet, Defendant continues, "she provides no evidence of discriminatory animus" as required by *Cole*. *See Cole*, 838 F.3d at 896. In light of precedent, and also, importantly, in light of the brevity and generality of Plaintiff's argument on this point, and the fact that the argument lays out those alleged differences in treatment but does not explain their significance, the Court finds Plaintiff's argument unpersuasive. Plaintiff has thus failed to satisfy this element, and her hostile work environment claim must fail for this reason alone.

### iii.  Plaintiff's Race-Based Retaliation Claim

In her response, Plaintiff argues that summary judgment is inappropriate on her retaliation claim. Title VII "prohibits employers from discriminating against an employee 'because he has opposed any practice made an unlawful employment practice by this subchapter.'" *Id.* (quoting 42 U.S.C. § 2000e-3(a)). Plaintiff asserts that Defendant retaliated against her after she filed her internal formal complaint on February 21, 2021, her original EEOC complaint on August 10, 2021, and her amended EEOC complaint on September 12, 2021.

 "To prevail on a Title VII retaliation claim, the plaintiff must prove "that (1) she engaged in an activity protected by the statute; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Anderson*, 104 F.4th at 654 (quoting *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (cleaned up)). In the context of a retaliation claim, the causal link must show "but-for" causation. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

"When the plaintiff establishes a prima facie case of retaliation, an employer may produce evidence which, if taken as true, would permit the conclusion that it had a legitimate non-discriminatory reason for taking the adverse employment action." *Id.* (quoting *Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020)). If Defendant meets this burden, Plaintiff must show that Defendant's reasons for the adverse employment action were pretextual. *Id.*

Plaintiff clearly satisfies the first element, as filing a complaint for discrimination, as she did in this case, is a protected activity. The Court now address the third element rather than the second. Even assuming that Plaintiff suffered an adverse employment action which Defendant contests, Plaintiff must show that the adverse action was motivated by a protected activity.

Defendant argues that Plaintiff cannot make such a showing, as "there is no evidence to reasonably conclude retaliatory motive played any role in her continued paid leave, reassignment, or the timeframe for investigating the allegations." According to Defendant, "Batiste-Waddell's continued leave and reassignment are directly related to her conduct on February 18, 2021 (i.e., her explosive and unprofessional behavior and refusal to participate in the drug test), not in retaliation for the complaint she submitted on February 21, 2021." In its brief in support of its motion, Defendant cites no cases in support of this proposition, seemingly regarding it as self-evident; but, in its reply, Defendant does dispute the implications of some of the cases cited by Plaintiff.

Plaintiff does cite cases on this point, in support of an argument that Defendant's reasons for placing and leaving Plaintiff on leave were pretextual. She cites *Garcia v. Sigmatron Int'l*, 842 F.3d 1010, 1019 (7th Cir. 2016) for the proposition that, "[c]ausal connection is established by circumstantial evidence like suspicious timing or the stated reason for adverse action [sic] is pretextual." She asserts that "[c]ausal connection can be proven by showing that the Defendants [sic] reason for the adverse action is pretext," citing *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). Finally, pointing to *Coleman,*

667 F.3d at 841, she holds that "[p]retext can be proven by showing that those similarly situated outside of

plaintiff's protected class were treated more favorably."  Relying on these cases, Plaintiff  argues primarily, that Plaintiff can show Defendant's adverse actions were motivated by her protected activity because another employee, Jennie Mast, "is similarly situated to Waddell" but "was treated more favorable [sic] than Waddell."

Plaintiff's argument fails in certain important respects. As Defendant points out in its response, the Seventh Circuit held in *Coleman* that a plaintiff "can show causation by showing that her complaints and EEO filings were a substantial or motivating factor" for the adverse action in question. *Id.* at 860. A plaintiff can demonstrate that this protected activity was a substantial or motivating factor either by presenting direct evidence or "by presenting a convincing mosaic of circumstantial evidence that would permit the same inference without the employer's admission." *Id.* One type of circumstantial evidence available to a plaintiff employing the latter approach is "evidence . . . that similarly situated employees were

treated differently," which is what Plaintiff aims to provide *Id.* However, even if viewed in a light most favorable to Plaintiff, the Court is unable to conclude that Mast was similarly situated to but better treated than Plaintiff. Mast was comparatively quickly not only reassigned but dismissed from her position entirely, while Plaintiff, even though on leave for a longer period, remained on Defendant's payroll until she resigned voluntarily.

**IV.    CONCLUSION**

Based on the foregoing, Defendant's Motion for Summary Judgment is

**GRANTED**. [DE 53].

**SO ORDERED** this 30th day of September 2025.


s/Scott J. Frankel
Scott J. Frankel
United States Magistrate Judge